STATE OF NORTH CAROLINA v. MORRIS LEE SHAW

No. 5A81

(Filed 30 March 1982)

1. **Criminal Law § 82.2— physician-patient privilege does not extend to optometrists**

　　The statutorily created physician-patient privilege is limited to those authorized to practice medicine or surgery and does not apply to optometrists. Therefore, in a prosecution for arson, the trial court erred in excluding testimony by an optometrist concerning the eyesight of a prosecuting witness. G.S. 8-53.

2. **Arson § 1— dwelling of "another" element satisfied by showing of joint occupants, including defendant**

　　The common law arson requirement that the dwelling burned be that of "another" is satisfied by a showing that some other person or persons, together with defendant, were joint occupants of the same dwelling unit. Therefore, where defendant resided in a home with his wife, three children and his wife's father; the dwelling was rented by defendant's father-in-law; and, at the time of the fire, defendant had been forced at gunpoint to leave the house by his father-in-law, the requirement that the dwelling burned be that of "another" was satisfied.

3. **Arson § 5— failure to instruct on attempted arson proper**

　　In a prosecution for first degree arson, the trial judge properly declined to instruct on the lesser offense of attempted arson where there was positive testimony that some of the wooden parts of a dwelling were actually burned or charred, and where there was no evidence of an attempt to burn which failed. G.S. § 15-170.

　　Justice MITCHELL took no part in the consideration or decision of this case.

APPEAL by defendant from judgment of *Godwin, J.* entered at the 8 December 1980 Criminal Session of Superior Court, ALAMANCE County, imposing a sentence of life imprisonment upon defendant's conviction of first degree arson.

　　Upon a plea of not guilty, defendant was tried on a bill of indictment, proper in form, charging him with willfully and maliciously burning the dwelling of Thomas Boswell which was occupied at the time of the burning, that being punishable by life imprisonment. G.S. § 14-58—subsequently amended effective 1 July 1981. The jury returned a verdict of guilty of arson as charged in the bill of indictment and defendant was sentenced to life

imprisonment. Defendant appealed. For error committed during the course of the trial, we reverse defendant's conviction and remand the case for a new trial.

*Rufus L. Edmisten, Attorney General by Douglas A. Johnston, Assistant Attorney General and Lucien Capone III, for the State.*

*Adam Stein, Appellate Defender, by James H. Gold, Assistant Appellate Defender, for Defendant-Appellant.*

MEYER, Justice.

I

[1] The basic question for review on this appeal is whether the physician-patient privilege against disclosure of confidential communications and information extends to optometrists. We conclude that it does not. Because of the trial judge's erroneous exclusion of testimony of the prosecuting witness's optometrist proffered by defendant, as privileged, defendant is entitled to a new trial.

The evidence in brief summary tended to show that on the late night and early morning of 22-23 September 1980 the defendant lived with his wife Glenda and three of her sister's children in the home of her father, Thomas Boswell, age 62. The home was a six-room wood frame single-family house rented by Mr. Boswell located at 645 Elizabeth Street in Burlington. While defendant had his personal possessions there, he stayed there sometimes and sometimes he did not. After the defendant and his wife retired to their bedroom on the night of 22 September, they became embroiled in a heated argument. The argument was so loud that Glenda's father, Mr. Boswell, was disturbed and went to their room, and finding them fighting on the bed, admonished them to be quiet so that he could sleep and so as not to disturb the neighbors. Boswell then went back to his bed, but in about five minutes Glenda started shouting again and continued to shout, asking her father to make the defendant leave her alone.

Mr. Boswell tried to ignore the shouting but finally got his single-barrel shotgun from beneath the head of his bed, went to Glenda's door and fired a shot into the floor. He then reloaded his

shotgun and threw Glenda's door open and told defendant to get out of the house. He then shut the door. While close to the door, he overheard defendant say to Glenda, "If I can't stay here, I'll fix this mother so can't nobody else stay here." He heard the front door slam and things got quiet. This occurred around midnight. About 12:30 a.m., the defendant came back and crept in through a window and was discovered in the kitchen. He came out of the kitchen with "one of these little box opener tricks with a blade on it" in his hand. Mr. Boswell, shotgun in hand, backed up and told defendant to "get out of here." After some discussion and further shouting, defendant sped away in his burgundy 1978 Thunderbird.

Mr. Boswell ordered one of the grandchildren to call the police and then went outside. He saw defendant's car come back up the street and park with its lights off in a church drive behind Boswell's home. About five minutes later defendant drove away with his lights off. Boswell, shotgun still in hand, then crept along the fence of the schoolhouse next door finally to a point about 36 to 40 feet from his back porch. He heard a neighbor's dog barking and saw someone at the porch strike a match which lit a gasoline trail that ran up on the back porch. Flames enveloped that area of the house. This was about 1:15 a.m. or a little before. Boswell testified that he could see the defendant there "just as plain as day" when defendant lit the fire. Defendant was facing him. Then defendant ran and disappeared into the darkness. Boswell testified that he was shocked to see defendant burning the house. Glenda and the children got out of the house. The police arrived. The whole back porch was in a blaze. Firemen arrived later. A one-gallon plastic container with gasoline in it was found at the scene. Other witnesses corroborated much of Boswell's testimony.

Boswell testified that he had no trouble with his vision in spite of being blind in his right eye. He wore glasses all the time and was wearing them at the time of the fire. He got them from Dr. Virgil Mewborn.

Burlington Police Officer John Gibson testified to the effect that from his home he saw a 1978 or 1979 Thunderbird pull into the church yard which adjoins Boswell's house with its lights off. The car door opened and the interior light came on. The occupant

of the car placed an object on the ground and drove away. The officer called headquarters and then investigated and found that the object was a one-gallon plastic container with an orange colored liquid in it that smelled like gasoline. He returned to his home and continued to watch it. He saw a black male walk to the container, pick it up, and walk off into the darkness. Within just two or three minutes, the fire began at Boswell's house. The container found at the fire scene was the one Officer Gibson saw in the church yard. The liquid in the container was subsequently analyzed and determined to be gasoline.

A Burlington Fire Department employee took samples of wood from the house and they were analyzed and found to have gasoline on them. There was evidence from several witnesses that wood on the porch and around the window had actually burned or was charred.

The defendant testified that he never threatened to burn the house, that he did not set the fire, had nothing to do with the incident, and was, in fact, some twenty or more miles away at the time of the fire. He also offered witnesses who corroborated his alibi evidence. The trial judge refused to allow the defendant to put on certain evidence concerning Boswell's eyesight by way of Boswell's optometrist as hereinafter set forth. The jury returned a verdict of guilty of arson in the first degree and defendant was sentenced to life imprisonment.

The defendant attempted to impeach Mr. Boswell's credibility through the testimony of Boswell's optometrist, Dr. Virgil Mewborn.[1] The pertinent part of the defendant's questioning of Dr. Mewborn, to which the State's objections were largely sustained, was as follows:

Q. Dr. Mewborn, in connection with your practice of optometry, did you have occasion to see as a patient one Thomas Lee Boswell?

COURT: Aren't you going to run into some confidentiality?

---

1. Dr. Mewborn, a licensed optometrist in North Carolina since 1967, testified that he never studied medicine.

MR. JOHNSON: There would be an objection interposed at the appropriate time if he asks a question leading to that, your Honor.

MR. MOSELEY: Well, your Honor, would you like to debate this issue then out of the presence of the jury?

COURT: No, sir, I don't see anything to debate.

Q. Dr. Mewborn, did you have occasion to examine Thomas Lee Boswell?

COURT: The OBJECTION has been interposed and is SUSTAINED.

A. Yes, I've seen him.

MR. JOHNSON: Move to strike the answer.

COURT: You will not consider the witness's testimony that he has examined Thomas Boswell.

MR. MOSELEY: May it please the Court I would like his testimony on the record.

COURT: You may at a subsequent time. If you have concluded your examination of this witness, you may get his answer to that question on the record.

I am familiar with the frames marked Defendant's Exhibit No. 2. Those frames are made by Swank Optical Company. It is a frame we use occasionally in our practice. I could not tell you if the lenses contained in those frames were prescribed by me or not. I can tell you what the prescription is. It is a hyperopic lens. It's a plus lens. It's approximately three diopters in power with a crook-top bifocal. These glasses correct farsightedness.

Q. In—layman's terms, I would ask how strong are the lenses?

A. Okay.

COURT: Can you say in layman's terms how strong or weak a lens is?

A. It's difficult, yes, sir.

COURT: How strong is strong.

A. Right. 20/20 vision is considered normal. These lenses would correct someone that had vision of approximately 20/200.

Q. All right. Do you know if Thomas Lee Boswell had vision in his left eye of 20/200?

MR. JOHNSON: OBJECTION.

COURT: The OBJECTION is SUSTAINED.

Q. Dr. Mewborn, I would ask you to assume these facts. I would ask you to assume that an individual sixty-two years of age was blind in his right eye and was wearing the lenses that are marked Defendant's Exhibit 1 and to assume that that individual was wearing those lenses and viewing an object at nighttime. Do you have an opinion satisfactory to yourself as to the vision of that individual compared with the normal of 20/20?

MR. JOHNSON: OBJECTION.

COURT: SUSTAINED.

The left lens on Defendant's Exhibit No. 2 is scratched pretty badly. It has some foreign substance on it. It is pitted in some way. I don't know if he has been working around machinery or has just abused them. Whatever is on the lenses will come off. The lens itself doesn't look like it's scratched too bad. It's just pretty dirty.

Q. Do you know if his vision would be impaired looking through the lens as you find it now?

A. Yes, sir, it would.

MR. JOHNSON: OBJECTION.

COURT: SUSTAINED.

Ladies and gentlemen, you will not consider the witness's answer to the last question as evidence.

. . . .

Record at pages 47-49.

In order to preserve the record, Dr. Mewborn testified out of the presence of the jury in summary as follows: He examined Boswell

once in November 1975 and again in April 1979. In November 1975 Mr. Boswell's eyesight was corrected to 20/20 in both eyes by glasses. When he saw him on 9 April 1979, Boswell told Dr. Mewborn that he had lost the sight in his right eye three days earlier. That eye had only light perception and was functionally blind. Boswell's vision in his left eye or with both eyes was 20/200 without corrective lenses. Even with glasses, the best vision possible for Boswell through his left eye was between 20/25 and 20/30. With both eyes it was the same. Boswell's night vision would be somewhat reduced. He could not say how much it would be reduced at night. Dr. Mewborn also testified that it would be very difficult to see through Boswell's left lens at night because there was a foreign substance on that lens that would block light from coming through. He also testified that he had nothing in his records signed by Mr. Boswell authorizing the release of any information about Boswell's treatment.

The trial court denied the defendant's motion that the jury be allowed to hear Dr. Mewborn's voir dire testimony. The defendant contends that the trial court committed reversible error in denying this motion and in sustaining the State's objections to Dr. Mewborn's testimony. We agree. In spite of defense counsel's repeated effort to get the trial judge to stake himself out on the record as to his reason for excluding Dr. Mewborn's testimony, he refused to do so. However, we must conclude from the judge's question to counsel, "Aren't you going to run into some confidentiality?" that his reason was his belief that the testimony was barred by a confidential privilege.[2]

We do not find in our reports any case in which a privilege has been found to exist in the optometrist-patient relationship. No such privilege existed at common law. In *People v. Baker*, 94 Mich. App. 365, 288 N.W. 2d 430 (1979), the Michigan Court of Appeals reversed the defendant's murder conviction based on the trial court's refusal to allow an optometrist to testify as to the

2. Even if such a privilege existed we fail to find in the record any claims of privilege by Mr. Boswell or any inquiry by the court or the District Attorney of Mr. Boswell as to whether he claimed the privilege. The privilege is that of the patient alone and cannot be asserted by any other person. The individual to whom the privilege belongs may of course waive it, either expressly or by implication. *Capps v. Lynch*, 253 N.C. 18, 22, 116 S.E. 2d 137, 140 (1960); *see also State v. Martin*, 182 N.C. 846, 109 S.E. 74 (1921).

results of an eye examination he performed on the only eyewitness to the shootings. That court said:

> There is no common law optometrist-patient privilege. Nor does the statutorily created physician-patient privilege apply; that privilege applies to persons duly authorized to practice medicine or surgery. M.C.L. § 600.2157; M.S.A. § 27A.2157. An optometrist is not duly authorized to practice medicine or surgery. The trial court should not have excluded this testimony.

94 Mich. App. 365, 368, 288 N.W. 2d 430, 431.

No privilege was recognized at common law even for communications between physician and patient. *State v. Martin*, 182 N.C. 846, 109 S.E. 74 (1921). *See also In re Farrow*, 41 N.C. App. 680, 255 S.E. 2d 777 (1979); 1 Stansbury's North Carolina Evidence § 63 Physician and Patient (Brandis rev. 1973). Like numerous other states, North Carolina has by statute created such a privilege. G.S. § 8-53 provides as follows:[3]

> § 8-53. *Communications between physician and patient.*
>
> No person, duly authorized to practice physic or surgery, shall be required to disclose any information which he may have acquired in attending a patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon. Confidential information obtained in medical records shall be furnished only on the authorization of the patient, or if deceased, the executor, administrator, or, in the case of unadministered estates, the next of kin; provided, that the court, either at the trial or prior thereto, or the Industrial Commission pursuant to law may compel such disclosure, if in his opinion the same is necessary to a proper administration of justice.

The physician-patient privilege is limited to those authorized to practice physic (*i.e.*, medicine) or surgery. An optometrist is not a licensed physician and is not authorized to practice medicine or surgery. *See* G.S. § 90-18. The practice of optometry is clearly defined in G.S. § 90-114 as follows:

---

3. For a general synopsis, see 50 N.C. L. Rev. 630 (1972).

§ 90-114. *Optometry defined.*

Any one or any combination of the following practices shall constitute the practice of optometry:

(1) The examination of the human eye by any method, other than surgery, to diagnose, to treat, or to refer for consultation or treatment any abnormal condition of the human eye and its adnexa; or

(2) The employment of instruments, devices, pharmaceutical agents and procedures, other than surgery, intended for the purposes of investigating, examining, treating, diagnosing or correcting visual defects or abnormal conditions of the human eye or its adnexa; or

(3) The prescribing and application of lenses, devices containing lenses, prisms, contact lenses, orthoptics, vision training, pharmaceutical agents, and prosthetic devices to correct, relieve, or treat defects or abnormal conditions of the human eye or its adnexa.

Provided, however, in using or prescribing pharmaceutical agents, other than topical pharmaceutical agents within the definition hereinabove set out which are used for the purpose of examining the eye, the optometrist so using or prescribing shall communicate and collaborate with a physician duly licensed to practice medicine in North Carolina designated or agreed to by the patient.

The practice of optometry as therein defined specifically excludes surgery and does not in any sense include the practice of medicine as that term is defined in G.S. § 90-18. Even in the use or prescription of pharmaceutical agents,[4] other than topical pharmaceutical agents used for the purpose of examining the eye, an optometrist is required to communicate and collaborate with a physician, designated or agreed to by the patient, who is duly licensed to practice medicine in North Carolina. By statutory

---

4. By the enactment of Chapter 482 of the 1977 Session Laws, the Legislature authorized optometrists, *inter alia*, to employ pharmaceutical agents for the purpose of "investigating, examining, treating, diagnosing or correcting visual defects or abnormal conditions of the human eye or its adnexa."

definition the practice of optometry by a legally licensed optometrist does *not* constitute the practice of medicine or surgery. G.S. § 90-18 provides in pertinent part as follows:

> Any person shall be regarded as practicing medicine or surgery within the meaning of this Article who shall diagnose or attempt to diagnose, treat or attempt to treat, operate or attempt to operate on, or prescribe for or administer to, or profess to treat any human ailment, physical or mental, or any physical injury to or deformity of another person: Provided, that the following cases shall not come within the definition above recited:
>
>     . . . .
>
> (6) The practice of optometry by any legally licensed optometrist engaged in the practice of optometry.

We hold that the statutorily created physician-patient privilege is limited to those authorized to practice medicine or surgery and does not apply to optometrists. The State gave no other reason for the objection to Dr. Mewborn's testimony and we find none. We therefore conclude that the learned trial judge erred in denying the defendant's motion to admit the testimony of Dr. Mewborn taken on voir dire and in sustaining the State's objections to that testimony.

Of the other questions brought forward on this appeal, only two present matters which are likely to recur on retrial. First, defendant contends that he was entitled to a directed verdict because he cannot be guilty of arson for the reason that he lived in the dwelling he is accused of burning—that is, that the dwelling was not the "dwelling of another." Second, he contends that the trial judge erred in not charging the jury on attempt to commit arson. He argues that he was entitled to such an instruction because there was evidence of that lesser included offense from which the jury could find that, though he attempted to burn the dwelling, no part of the dwelling was ever actually "burned." We will now address those contentions for the benefit of the court and the parties on the retrial.

## II

Common law arson is the willful and malicious burning of the dwelling house of another person. *State v. White*, 288 N.C. 44, 215

S.E. 2d 557 (1975). 3 C. Torcia, Wharton's Criminal Law § 345 (14th ed. 1980); A. Curtis, The Law of Arson § 1 (1936).

[2] Was the dwelling here "the dwelling house of another person"? We conclude that it was. The fact that defendant resided in the house does not, under the circumstances here, prevent his conviction for the arson of that dwelling. The dwelling in question was rented by Thomas E. Boswell. Mr. Boswell lived there with his twenty-two year old daughter, who is defendant's wife, and his three female grandchildren. "Sometimes [the defendant] was there and sometimes he wasn't." Defendant was living there on the evening of the fire and had all of his personal effects in the house. At best defendant can be considered no more than a joint occupant of the Boswell house. Moreover, at the time of the fire defendant had been forced at gunpoint to leave the house by Mr. Boswell. The defendant testified that, after leaving the Boswell house to avoid the police, he "was going to go out to my mother's house because I didn't have anywhere to stay that night."

In *State v. Jones*,[5] Justice Exum said:

> [T]he main purpose of common law arson is to protect against danger to those persons who might be in the dwelling house which is burned. Where there are several apartments in a single building, this purpose can be served only by subjecting to punishment for arson any person who sets fire to any part of the building.

296 N.C. 75, 77-78, 248 S.E. 2d 858, 860 (1978). *See also State v. White*, 288 N.C. 44, 215 S.E. 2d 557.

The rationale expressed by Justice Exum in *Jones*, to wit, the protection of persons who might be in the dwelling, is equally applicable to joint occupancy of a single dwelling unit as to separate apartments in the same building. The need for protection of Mr. Boswell, Glenda Shaw, and the three grandchildren was just as compelling, and perhaps more so, in this joint occupancy situation as it would have been had they been occupants of an adjoining apartment. The wisdom of applying that rationale

---

5. In *Jones*, defendant was convicted of arson for the burning of his own apartment, which he shared with another man in a homosexual relationship, and which was located in a building in which there were three other occupied apartments.

to joint occupancy situations is highlighted by the facts of this case. At the time defendant is alleged to have set the fire and the entire rear of the house became engulfed in flames, it was occupied by Glenda Shaw and Boswell's three grandchildren. They were able to escape by running out the front door. Fortunately, police officer Mark Adams saw several females screaming and running towards him, called for help, and used his fire extinguisher in an attempt to extinguish the blaze until fire department personnel arrived.

While there is some authority in older cases from other jurisdictions to the contrary,[6] we find the need for protection from willful and malicious burning of a dwelling house so compelling that we hold that the common law arson requirement that the dwelling burned be that of "another" is satisfied by a showing that some other person or persons, together with the defendant, were joint occupants of the same dwelling unit.

### III

[3] The defendant contends that he is entitled to a new trial because the trial judge failed to charge the jury on *attempted* arson despite defendant's request that he do so.

Where there is evidence of defendant's guilt of a lesser degree of the crime set forth in the bill of indictment, the defendant is entitled to have the question submitted to the jury even in the absence of a specific prayer for the instruction. *State v. Moore*, 300 N.C. 694, 268 S.E. 2d 196 (1980). The felony of attempt to commit arson is a lesser included offense of the crime of arson.

G.S. § 15-170 provides: "Upon the trial of any indictment the prisoner may be convicted of the crime charged therein or of a less degree of the same crime, or an attempt to commit the crime so charged, or of an attempt to commit a less degree of the same crime." The provisions of this statute in regard to conviction of a lesser degree of the same crime charged in the bill of indictment applies only where there is some evidence that a less degree of the crime has been committed.

---

6. *See* A. Curtis, The Law of Arson §§ 42, 43, 49 (1936); R. Perkins, On Criminal Law, ch. 3, § 2 at 226 (2d. ed. 1969); Annot., 17 A.L.R. 1168, 1169 (1922); *State v. Young*, 153 Mo. 445, 55 S.W. 82 (1900); *Shepherd v. The People*, 19 N.Y. (5 Smith) 537 (1859). *See also People v. De Winton*, 113 Cal. 403, 45 P. 708 (1896); *State v. Kenna*, 63 Conn. 329, 28 A. 522 (1893).

If there was sufficient evidence from which the jury could find that there was an actual "burning" of the Boswell house, and if there is *no* credible evidence from which the jury could find an attempt to burn which failed, defendant would not be entitled to an instruction on the lesser included offense of attempt to commit arson.[7]

The evidence as to the burning came from several sources.[8]

Thomas Boswell testified, *inter alia*, that:

[The match] lit that gas under his feet, come down the edge of the porch and run back in there. When he put the match down, it lit the ground afire around his feet, come up to the edge of the porch, and went back in by the bathroom. It might have made a big whoosh.

. . . .

It was—all the back part was just in a light blaze.

. . . .

. . . It was something up there that would burn because the whole back porch was in a blaze.

. . . that fire leaped from the—going on up in the back porch, going up around by the bathroom and came around the porch and met back there in the corner and it made a noise like it was trying to explode.

. . . .

It went off in a flash like that and stayed like that until the firemen put it out. It went whoosh—

. . . .

---

7. We find too frequently that the question of whether a part of the structure was actually consumed by the flames arises for the first time in the appellate courts. This could easily be avoided by the prosecutor's eliciting direct testimony that a part of the structure was in fact consumed by the flames, charred, or terms of like meaning.

8. While all of the quoted testimony relates to the fire, those portions underlined refer specifically to areas of the house actually "burned" or "charred."

John N. Gibson, a Burlington police officer, testified:

As I saw the flame, a police car was coming . . . . I told him to call the fire department because there was a fire in the next block . . . .

I went in the direction of where the fire was coming from. As I approached the fire, it was a house . . . . The whole back area of the house was engulfed in flames.

Craig Yarborough, a Captain of the Burlington Fire Department, who examined the house the following morning, testified:

I observed that *the back porch of the house had been on fire.*

. . . .

. . . We collected samples of wood and debris off the back porch and the fire area . . . .

. . . .

We were looking at the *charred material around the window.*

. . . .

Where the wall around *the bedroom window had been burned,* the areas where the — it was wet.

When asked by the Court "*What was burned?*" Captain Yarborough answered, "*The wall boarding,*" and also testified:

. . . .

We picked places around the area where they were the worst. We moved away from *where the fire actually had burned* and picked pieces around it to collect our samples.

. . . Yes, there had not been a complete ignition of the floor area of the back porch. From the back porch floor area up to the windowsill on the back porch had not been burned. *The area had burned from the base of the window upward.*

. . . .

*Fire damage is where the fire actually charred into the wooden boards on the back porch.*

. . . .

The curtains on the windows were burned, yes, sir, *on the inside of the windows were burned.*

. . . .

[Referring to photographs] State's Exhibit No. 4 . . . is a picture of *a burned area around the bedroom window. There is a burned area under the window* and a blistering effect on the right and left side of the window.

State's Exhibit No. 5 is a photograph which *shows a burned area of the ceiling of the back porch area* . . . .

. . . State's Exhibit No. 6 is a picture that describes *a burned area that would be directly opposite the bedroom window* . . . the inside portion of the outside wall of the back porch.

Mark Adams, a Burlington police officer, testified:

I looked to my right and there was a residence with the back covered with flames . . . .

. . . .

. . . the exterior wall of the porch where the screen would stop was in flames. *The floor of the porch and the wall around the rear window* and some of the items on the back porch *were burning,* . . . .

Specifically with regard to the necessity of showing an actual burning, the trial judge correctly charged the jury in part as follows:

Now the law does not require that the fire completely consume the dwelling house, that it completely consume any particular part of the dwelling house. A partial burning or the slightest charring is sufficient under the law to constitute the burning of a dwelling house contemplated by the law. A mere discoloration, smoke, stains, does not constitute a burning. Charring does. The slightest charring is sufficient to constitute burning under this law.

To satisfy the proof of a "burning" it is not necessary that the building be wholly consumed or even materially damaged. It is sufficient if any part, however small, is consumed. A building is

burned within the common law definition of arson when it is char-
red. *State v. Rogers*, 168 N.C. 112, 83 S.E. 161 (1914); *State v.
Hall*, 93 N.C. 571 (1885); *State v. Sandy*, 25 N.C. (3 Ired.) 570
(1843). *See also* 6A C.J.S. Arson § 10; 5 Am. Jur. 2d, Arson and
Related Offenses § 7; Annot., 1 A.L.R. 1163 (1919); 5A Words and
Phrases, "Burning" at 590.

In the case before us, we find positive testimony that some of
the wooden parts of the dwelling were actually burned or char-
red.

If there is no evidence from which a jury could reasonably
find that there was an attempt to burn which failed, defendant is
not entitled to an instruction on attempted arson.

> The trial court is not required to charge the jury upon the
> question of the defendant's guilt of lesser degrees of the
> crime charged in the indictment when there is no evidence to
> sustain a verdict of defendant's guilt of such lesser degrees.

4 N.C. Index 3d, Criminal Law § 115 (1976).

The principle was very well expressed by Justice Lake in
*State v. Lampkins*[9] as follows:

> When, upon all the evidence, the jury could reasonably
> find the defendant committed the offense charged in the in-
> dictment, but could not reasonably find that (1) he did not
> commit the offense charged in the indictment and (2) he did
> commit a lesser offense included therein, it is not error to
> restrict the jury to a verdict of guilty of the offense charged
> in the indictment or a verdict of not guilty, thus withholding
> from their consideration a verdict of guilty of a lesser includ-
> ed offense. Under such circumstances, to instruct the jury
> that it may find the defendant guilty of a lesser offense in-
> cluded within that charged in the indictment is to invite a
> compromise verdict whereby the defendant would be found
> guilty of an offense, which he did not commit, for the sole

---

9. In *Lampkins*, the prosecutrix testified that she had been raped and the
defendant testified he had never had intercourse with her, and that he never touch-
ed her after leaving the house at which they were party guests. The Court there
held that this was evidence that the defendant committed neither the crime of rape
nor any lesser included offense.

reason that some of the jurors believe him guilty of the greater offense. The mere possibility that the jury might believe part but not all of the testimony of the prosecuting witness is not sufficient to require the Court to submit to the jury the issue of the defendant's guilt or innocence of a lesser offense than that which the prosecuting witness testified was committed.

286 N.C. 497, 504, 212 S.E. 2d 106, 110 (1975). *See also State v. Moore,* 300 N.C. 694, 268 S.E. 2d 196; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974); *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111 (1972); *State v. Carnes,* 279 N.C. 549, 184 S.E. 2d 235 (1971); *State v. Murry,* 277 N.C. 197, 176 S.E. 2d 738 (1970); *State v. Smith,* 201 N.C. 494, 160 S.E. 577 (1931); 4 N.C. Index 3d, Criminal Law § 115.

Shaw's defense in this case was an alibi—that he was not present when the crime occurred. He testified that on the night in question, at the hour in question, he was at his mother's house, some twenty miles away and that he and his sister's boyfriend, James Graves, did not leave his mother's house until about 1:40 p.m., and then went to a private club in Hillsborough. James Graves took the stand and corroborated defendant's testimony in this regard. The defendant's mother testified that at the critical time he was at her home. His defense was that he could not have committed any degree of the crime charged because he was not even in the area when it happened. If the jury believed defendant's evidence, he could not be guilty of the crime of arson *nor* any lesser included offense.

In *State v. Noell,* the State's witness testified that the defendant had raped her. Noell testified that he had never even seen her prior to the trial. Justice Moore there said:

In the present case defendant's defense was that of an alibi—that he was not present when the alleged offense occurred. He, therefore, completely denies assaulting the prosecutrix or forcing her to have sexual intercourse with him. The prosecutrix testified positively that after defendant had choked her and threatened to kill her, he forcibly and against her will had sexual intercourse with her, and that he did in fact penetrate her. Thus, there was no evidence of an assault

with intent to commit rape, and the trial court was not required to charge on the lesser included offense.

284 N.C. 670, 699, 202 S.E. 2d 750, 769.

*State v. Green,* 298 N.C. 793, 259 S.E. 2d 904 (1979), cited by the defendant, is clearly distinguishable. In *Green* the defendant told the police that he was at the scene of the fire and in fact attempted to set a fire at the front door of the house. The occupants testified that they discovered the fire at the back door on the porch and that they escaped through the front door. There was no evidence that any fire was found at or near the defendant's location, that is, at the front door.

While we find ample evidence of an actual burning, we find no evidence of an attempt to burn which failed. We therefore conclude that there is no evidence in the record from which the jury could have found that defendant was guilty of an attempt to commit arson, and therefore defendant was not entitled to a jury instruction on that lesser included offense.

The defendant cites two cases, *State v. Vesta Ray Arnold,* 285 N.C. 751, 208 S.E. 2d 646 (1974), and, *State v. Rudolph Arnold,* 264 N.C. 348, 141 S.E. 2d 473 (1965), for the proposition that defendant could be lawfully convicted of *attempted* arson under facts he considers similar to those of this case. In the *Rudolph Arnold* case, the defendant was charged only with attempted arson. In the *Vesta Ray Arnold* case, the defendant was charged with both offenses. The indictment for attempted arson was quashed for several technical errors and defendant was tried on the arson indictment. However, at the beginning of the trial the solicitor announced that the State would seek a verdict of guilty of only the lesser included offense of attempt to commit arson. Both of the *Arnold* cases concerned the crime of *attempt to commit arson.* That is not the question here and we do not find those cases apposite. Here we are concerned with whether the evidence supports the verdict of guilty of *arson.*

For the trial judge's error in excluding testimony of the prosecuting witness's optometrist proffered by the defendant to impeach the credibility of Mr. Boswell, the only eyewitness to the actual setting of the fire, defendant is entitled to a

New trial.

Justice MITCHELL took no part in the consideration or decision of this case.