IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-236

No. COA20-273

Filed 1 June 2021

Henderson County, Nos. 16 CRS 862–64

STATE OF NORTH CAROLINA

v.

SHERRY LEE LANCE

Appeal by defendant from judgment entered 7 November 2019 by Judge Athena Fox Brooks in Henderson County Superior Court. Heard in the Court of Appeals 9 March 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Thomas J. Felling, for the State.*

*Warren D. Hynson for defendant.*

DIETZ, Judge.

Defendant Sherry Lee Lance appeals her convictions for second degree arson, conspiracy to commit second degree arson, and insurance fraud, all stemming from allegations that Lance conspired with her mother to burn down the home they shared and collect insurance proceeds.

Lance's central argument is that the State could not prove an essential element of the arson charges—that Lance burned the dwelling house of another—because the

only other inhabitant of the home was her mother, who allegedly conspired with her to burn the home.

As explained below, we reject this argument. The State's evidence showed that Lance's mother still lived in the home when the fire occurred, and there was no evidence that Lance's mother knew when or how the fire would be set. Thus, the State's evidence was sufficient to send the case to the jury.

Lance also argues that the trial court erred by admitting the testimony of the State's fire investigation expert and committed plain error in the jury instruction concerning insurance fraud. We likewise reject these arguments and hold that the trial court properly considered the appropriate reliability factors before admitting the expert testimony and did not commit plain error in its jury instructions.

Finally, Lance alleges—and the State concedes—that there was insufficient evidence to support the trial court's award of restitution. We vacate the restitution order and remand that matter for further proceedings.

## Facts and Procedural History

In September 2016, a house in Fletcher was destroyed by a fire. At the time of the fire, Defendant Sherry Lance and her mother Jonnie Turner lived in the house. They had leased it from the owner for about two years.

After the fire, Fletcher Police Sergeant Ronald Diaz, the town fire chief, the fire marshal, and an SBI agent went to the property to investigate. The SBI agent

brought a canine trained to identify accelerants or incendiaries, but the canine did not alert to any.

¶ 8 There was a large hole in the kitchen floor area that the investigators believed was the origin point of the fire. Sergeant Diaz observed that there was an unusually low number of personal belongings in the home and "not what you would expect in a home that was just lost to a fire." Based on that observation, Sergeant Diaz contacted the National Insurance Crime Bureau to see if Lance had renter's insurance on her personal property in the home. Sergeant Diaz learned that Lance had obtained a renter's insurance policy in May 2016, about four months prior to the fire, and had filed a claim for items lost in the fire.

¶ 9 On 15 September 2016, Casey Silvers, a fire investigator hired by the insurance company to investigate the cause of the fire, went to the property to investigate along with a claims adjuster. The claims adjuster also met with Lance to take her recorded statement about the fire. In her recorded statement, Lance explained that she told the landlord about some electrical problems in the home but he would not fix them. Lance explained that she thought the fire was electrical. When asked where she was and what she did on the day of the fire, Lance stated that she had gone "dumpster diving" with her mother, taking their two dogs with them. Lance submitted a "loss inventory list" to the adjuster, listing the items of personal property that she claimed were lost in the fire.

¶ 10    Several months later, Sergeant Diaz discovered that Turner had rented a storage unit in Fletcher the day before the fire. After obtaining a search warrant, Sergeant Diaz searched the unit and found a large number of personal belongings and household items, as well as personal financial and legal documents belonging to Lance. Various items that Sergeant Diaz found in the storage unit matched items listed on the loss inventory form Lance submitted to her insurance company. Sergeant Diaz obtained video footage from the storage facility, which showed Lance and Turner accessing the storage unit the day before the fire, moving items into the unit, and later moving items out of the unit after the fire.

¶ 11    The State charged Lance with second degree arson, conspiracy to commit second degree arson, and insurance fraud. The case went to trial.

¶ 12    At trial, the homeowner, the insurance adjuster, and Sergeant Diaz testified to the events described above. Along with Sergeant Diaz's testimony, the State presented the video footage from the storage facility and photographs of the items found inside the storage unit.

¶ 13    The State also offered the testimony of Casey Silvers as an expert in the field of fire and arson investigation. Lance objected on the ground that Silvers's expert testimony was not reliable under Rule 702. Both parties conducted *voir dire* questioning of Silvers. The trial court then ruled that Silvers's testimony was admissible "under the three prong reliability test" of Rule 702 and that it would allow

Silvers to testify to his conclusion that the results of his investigation excluded possible causes of the fire "with the exception of an incendiary causation."

¶ 14     The State also presented evidence that Lance made incriminating statements to family members following the fire. Lance's stepdaughter testified that, in 2018, Lance made statements to her indicating that Lance was "in trouble for burning [her] house down." Lance's father testified that Lance came to live with him in 2017 and admitted that she set fire to her home in North Carolina, telling him that she set the fire to collect renter's insurance.

¶ 15     At the close of the evidence, Lance moved to dismiss the arson charges, arguing that the State failed to present sufficient evidence to show that the house was "the dwelling of another person" as required for arson because the only inhabitants of the house at the time of the fire were Lance and her alleged co-conspirator in the arson plan, and thus, "this is a case where there was no risk to anybody else." The trial court denied the motion.

¶ 16     On 7 November 2019, the jury convicted Lance of all three charges. The trial court consolidated the charges and sentenced Lance to a term of 10 to 21 months in prison. The court also ordered Lance to pay $40,000 in restitution to the homeowner. Lance appealed.

## Analysis

### I.     Denial of motion to dismiss

¶ 17      Lance first argues that the trial court erred in denying her motion to dismiss the arson and conspiracy to commit arson charges because the State failed to present sufficient evidence that the house in question was inhabited by "another person," an essential element of those arson charges. Lance asserts that the only other inhabitant of the house, her mother Jonnie Turner, was her alleged co-conspirator in the arson plan. Thus, she argues, the house was not the dwelling of "another" because "neither co-conspirator would have been endangered by the hazards of a burning they allegedly planned together."

¶ 18      "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). The trial court must deny a motion to dismiss if the State presented "substantial evidence" of each essential element of the offense charged. *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78–79, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339

N.C. 172, 192, 451 S.E.2d 211, 223 (1994).

Arson "is the wilful and malicious burning of the dwelling house of another person." *State v. White*, 288 N.C. 44, 50, 215 S.E.2d 557, 561 (1975). The essential elements of second-degree arson are: "(1) the willful and malicious burning (2) of the dwelling (i.e., inhabited) house of another; (3) which is unoccupied at the time of the burning." *State v. Scott*, 150 N.C. App. 442, 453, 564 S.E.2d 285, 293 (2002). Our Supreme Court has held that the "arson requirement that the dwelling burned be that of 'another' is satisfied by a showing that some other person or persons, together with the defendant, were joint occupants of the same dwelling unit." *State v. Shaw*, 305 N.C. 327, 338, 289 S.E.2d 325, 331 (1982).

The central issue in this case is whether Lance's mother, Jonnie Turner, qualifies as "another" person under the elements described above. The parties acknowledge that our appellate courts have never directly addressed whether an alleged co-conspirator in a plan to commit arson can be considered another person for purposes of establishing the required elements of arson. We hold that under the facts of this case, there was sufficient evidence that the home was the dwelling of another.

First, the elements of this offense and our existing precedent do not provide any exception for co-conspirators, nor do they require that the other person living in the home be unaware or uninvolved in the plan to burn the home. For example, in *Shaw*, our Supreme Court held that the "requirement that the dwelling burned be

that of 'another' is satisfied by a showing that some other person or persons, together with the defendant, were joint occupants of the same dwelling unit" without offering any exceptions for categories of persons who would not qualify as "another." 305 N.C. at 338, 289 S.E.2d at 331. Similarly, in *State v. Eubanks*, this Court emphasized that a house "is the dwelling house 'of another' if someone other than the defendant lives there." 83 N.C. App. 338, 339, 349 S.E.2d 884, 885 (1986). Again, the holding required only that "someone other than the defendant lives there." *Id.*

¶ 22     To be sure, these earlier cases involved homes that the defendant occupied together with others who were not involved in the arson plan. *See Shaw*, 305 N.C. at 328–29, 289 S.E.2d at 326–27; *Eubanks*, 83 N.C. App. at 339–40, 349 S.E.2d at 885. But we find nothing in these holdings that *required* those third parties to be innocent or uninvolved in the arson. *Shaw*, 305 N.C. at 337, 289 S.E.2d at 331; *Eubanks*, 83 N.C. App. at 339, 349 S.E.2d at 885. To the contrary, in *Eubanks*, the defendant warned the other inhabitant of the home to get out, take his belongings, and find another place to live in advance of the fire. 83 N.C. App. at 339–40, 349 S.E.2d at 885. Nevertheless, this Court found sufficient evidence of the essential elements of arson. *Id.* As these prior cases establish, the critical inquiry in determining whether a house "is the dwelling house 'of another'" is simply whether "someone other than the defendant lives there." *Id.* at 339, 349 S.E.2d at 885.

¶ 23     Lance cites to this Court's opinion in *State v. Ward*, where we held that the

facts "precluded defendant's conviction of common law arson" based on facts showing the other inhabitant's "consent to, if not active participation in, a scheme with defendant to burn the [home]." 93 N.C. App. 682, 686, 379 S.E.2d 251, 254 (1989). But our reasoning in that case was that the other inhabitant, with knowledge of the arson plan, "had permanently abandoned the [home] at the time of the burning" and was "living elsewhere at the time of the burning." *Id.* We held that "[u]nder these particular facts, there was no danger to anyone who 'might' have been in the [home] at the time it burned" because no one other than the defendant was currently living there. *Id.* at 686, 379 S.E.2d at 253.

¶ 24        In this case, by contrast, Lance's mother lived in the home at the time it was burned. Thus, unlike *Ward*, in this case there was a risk that Turner could have been in the home at the time it was burned, even assuming Turner participated in the plan to set the fire.

¶ 25        Moreover, an exception to this arson requirement for people who are aware of, or participate in, the plan to burn the dwelling is not consistent with the general purpose of criminalizing arson. When examining the scope of a criminal law, we consider "the public policy of the State as declared in judicial opinions and legislative acts, the public interest, and the purpose." *State v. Wagoner*, 199 N.C. App. 321, 324, 683 S.E.2d 391, 395 (2009), *aff'd,* 364 N.C. 422, 700 S.E.2d 222 (2010). In explaining its holding in *Shaw*, the Supreme Court noted that "the main purpose of common law

arson is to protect against danger to those persons who might be in the dwelling house which is burned." 305 N.C. at 337, 289 S.E.2d at 331. In other words, the "gravamen of the offense of common law arson is the danger that results to persons who are or might be in the dwelling." *White*, 288 N.C. at 50, 215 S.E.2d at 561. Knowledge of, or participation in, a plan to commit arson does not remove the danger that the other person could be injured or killed when the burning occurs. Indeed, in this case, there is no evidence that Turner knew when the fire would be set, how it would be set, where in the house it would be set, or how much of the house would be destroyed. The evidence is solely that Turner assisted with other aspects of the conspiracy, such as leasing the storage unit the day before the fire and moving various items from the house into that unit. The State's evidence established that Turner was a person living in that dwelling who could have been in the home at the time it was burned, and that is all that is required to satisfy this element of the arson offenses in this case. Accordingly, we hold that the trial court did not err by denying Lance's motion to dismiss.

## II. Admission of fire investigator's expert testimony

Lance next argues that the trial court erred in admitting Casey Silvers's expert testimony because the court failed to conduct a proper reliability analysis under Rule 702 of the Rules of Evidence and because Silvers's testimony was based on an unreliable method.

A trial court's ruling to admit expert testimony under Rule 702 "will not be reversed on appeal absent a showing of abuse of discretion." *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016). A trial court "may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *Id.* "Under the abuse of discretion standard, our role is not to surmise whether we would have disagreed with the trial court, but instead to decide whether the trial court's ruling was so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 899, 787 S.E.2d at 15 (citation omitted).

Lance first asserts that the trial court "failed to conduct a proper analysis under Rule 702" because, despite "purporting to apply the three-part reliability test" in Rule 702, "the trial court's ruling shows that it only considered the first prong, but not the second or third." Thus, Lance argues, the trial court "failed to properly perform—and abdicated—its gatekeeping function, manifesting an abuse of discretion."

Under Rule 702, expert testimony must meet a three-pronged reliability test: (1) the testimony must be based upon sufficient facts or data; (2) the testimony must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. N.C. R. Evid. 702(a)(1)–(3); *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9. "The precise nature of the

reliability inquiry will vary from case to case depending on the nature of the proposed testimony. In each case, the trial court has discretion in determining how to address the three prongs of the reliability test." *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9. "The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether* that expert's relevant testimony is reliable." *Id.* "Whatever the type of expert testimony, the trial court must assess the reliability of the testimony to ensure that it complies with the three-pronged test in Rule 702(a)(1) to (a)(3)." *Id.* at 892, 787 S.E.2d at 10.

Here, the trial court heard extensive *voir dire* testimony from Silvers. Silvers testified that he works as a senior fire investigator with a fire investigation firm, where he conducts origin and cause investigations for fires, using the scientific method to determine causation. Silvers stated that he has education and training in the field for more than 15 years and that he has completed various courses in fire investigation, expert testimony, and evidence collection through the National Fire Academy. He attends yearly seminars and classes on investigations and is regularly tested on his knowledge. He testified that he is a certified fire investigator, teaches classes in arson detection, and has investigated over 800 fires. Silvers went on to describe his process of using the scientific method to investigate a fire by gathering data, analyzing the data, forming hypotheses on possible fire causes, attempting to disprove the hypotheses, and then attempting to confirm any remaining hypotheses.

He testified that this method is recommended by the National Fire Protection Association's guidelines.

¶ 31    During questioning from Lance, Silvers testified that he is familiar with the term "negative corpus," which is a method that uses the elimination of accidental causes to conclude that a fire was caused by human agency, and that the negative corpus approach is not consistent with the scientific method. But Silvers clarified that he did not conclude that the fire in this case had an incendiary or human cause, only that he could not rule out the hypothesis of an incendiary cause based on the information gathered in his investigation. Silvers explained that his observations of the fire patterns and other evidence from the fire were indicative of an incendiary fire, which is why he could not exclude that hypothesis. Silvers testified that, even with negative test results for ignitable liquids, an incendiary cause could not be ruled out because there are incendiary sources that would not give a positive result.

¶ 32    Following this testimony, the trial court ruled that, "under the three prong reliability test," it would allow Silvers to testify about his conclusion that he had excluded other causes of the fire "with the exception of an incendiary causation" and that "he can say he excluded other things." The court noted, "I want it very clear that he just basically couldn't exclude that by his scientific means, not that means that's what happened."

¶ 33    In light of the trial record, the trial court's stated reasoning, and the court's

express pronouncement that it considered the three reliability factors in Rule 702, we hold that the trial court's ruling was within the court's sound discretion. *McGrady*, 368 N.C. at 893, 787 S.E.2d at 11. Silvers's extensive *voir dire* testimony covered all three prongs of the Rule 702 reliability test, describing in detail the facts and data he collected in conducting his investigation, the principles and methods he applied in accordance with his training and the guidelines for his profession, and the way he applied those principles and methods to the facts of this case to reach his conclusion that he could not exclude an incendiary cause. *See* N.C. R. Evid. 702(a)(1)–(3); *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9. The trial court was not required to make detailed findings addressing each prong of Rule 702. The court's statement that it considered the three-prong analysis is sufficient to show that the trial court understood the applicable standard and exercised its discretion in choosing to admit the testimony under that standard. *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9; *State v. Gray*, 259 N.C. App. 351, 355, 815 S.E.2d 736, 739–40 (2018). Accordingly, we reject Lance's claim that the trial court failed to engage in the appropriate Rule 702 analysis.

¶ 34    Lance also contends that the expert testimony should have been excluded because Silvers used a method, known as the negative corpus approach, that is unscientific and *per se* unreliable. Lance points to portions of the National Fire Protection Association's guidelines cautioning that "determining the ignition source

for a fire, by eliminating all ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source for which there is no supporting evidence of its existence, is referred to by some investigators as *negative corpus*." NFPA 921, ¶ 19.6.5 (2014 ed.). The guidelines explain that the negative corpus process "is not consistent with the scientific method, is inappropriate, and should not be used." *Id.*

¶ 35    But Silvers testified that he understood the negative corpus approach and its flaws and that he did not rely on negative corpus in reaching his conclusion about the cause of the fire in this case. Silvers testified that he applied the scientific method and process of elimination to rule out various hypotheses on the cause of the fire, in accordance with his profession's guidelines.

¶ 36    Again, the trial court was within its sound discretion to conclude that this testimony was admissible under Rule 702. "Rule 702 does not mandate particular procedural requirements, and its gatekeeping obligation was not intended to serve as a replacement for the adversary system." *Gray*, 259 N.C. App. at 355, 815 S.E.2d at 739–40 (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof continue as the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 355, 815 S.E.2d at 740. Here, there were appropriate means to challenge Silvers's testimony through contrary evidence and cross-examination—for example, by underscoring that

Silvers's analysis did not establish causation.

Finally, even assuming the admission of this expert testimony was error—and we are not persuaded that it was—the error was harmless. This court may not order a new trial based on an evidentiary error unless the error was prejudicial, meaning "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." *State v. Babich*, 252 N.C. App. 165, 172, 797 S.E.2d 359, 364 (2017). Here, the State's evidence showed that Lance purchased an insurance policy shortly before the fire, that there was an unusually low number of personal belongings in the home at the time of the fire, and that Lance had moved many of her personal belongings from the house into a storage unit the day before the fire. Lance also admitted to two family members that she set the fire. In light of this evidence, Lance failed to show a reasonable possibility that, had the expert testimony been excluded, the jury would have reached a different verdict. *Id.* Accordingly, we find no error in the trial court's admission of the challenged expert testimony.

## III. Challenge to jury instructions on insurance fraud

Lance next contends that the trial court committed plain error in the jury instructions concerning insurance fraud. Lance argues that the court failed to specify the particular false statement or misrepresentation alleged in the indictment.

Lance concedes that she did not object to the instructions at trial and thus we

review this issue solely for plain error. "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* Plain error should be "applied cautiously and only in the exceptional case" where the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.*

¶ 40    A defendant "must be convicted, if convicted at all, of the particular offense charged in the bill of indictment." *State v. Locklear*, 259 N.C. App. 374, 380, 816 S.E.2d 197, 202 (2018). With respect to the insurance fraud claim, this principle means that the trial court should "instruct the jury on the misrepresentation as alleged in the indictment." *Id.* at 383, 816 S.E.2d at 204. But a "jury instruction that is not specific to the misrepresentation in the indictment is acceptable so long as the court finds no fatal variance between the indictment, the proof presented at trial, and the instructions to the jury." *Id.*

¶ 41    Here, there is no variance between the allegations in the indictment and the State's evidence at trial. The indictment alleged that Lance provided a false "written and oral statement" to her insurer in which she "claimed that her personal property was destroyed by an accidental fire." The jury instruction required the jury to

determine if Lance's statements about the insurance policy "contained false or misleading information concerning a fact or matter material to the claim," but it did not identify the particular statement alleged in the indictment.

¶ 42    The State's evidence showed that, following the fire, Lance met with an insurance adjuster to provide a recorded statement for her renter's insurance claim in which she told the adjuster she thought the fire was "electrical" and provided an inventory of personal property she claimed was destroyed in the fire. The State contended that these statements were false and that Lance set the fire.

¶ 43    The State did not present any evidence of other false statements Lance made to her insurer aside from those regarding the cause of the fire and the property that was destroyed. Lance asserts that there was evidence of "more than one statement by Ms. Lance the jury could interpret as false or misleading," but all of these statements concerned the alleged destruction of her property through a fire that Lance claims she did not cause. Viewed in context, these statements all fell within the scope of the specific misrepresentation alleged in the indictment that her property was destroyed by an accidental fire. Accordingly, we reject this argument and find no plain error in the trial court's instructions to the jury.

## IV.    Restitution award

¶ 44    Finally, Lance argues that the trial court erred in ordering her to pay $40,000 in restitution without a sufficient evidentiary basis of testimony or documentary

evidence to support the amount of restitution ordered. The State concedes error on this issue and we agree.

¶ 45     This Court reviews *de novo* the issue of whether a trial court's restitution order was supported by evidence at trial or sentencing. *State v. Hardy*, 242 N.C. App. 146, 159, 774 S.E.2d 410, 419 (2015). The amount of restitution set by the trial court must be supported by *evidence* at trial. *State v. Moore*, 365 N.C. 283, 285, 715 S.E.2d 847, 849 (2011). A "restitution worksheet, unsupported by testimony or documentation, is insufficient to support an order of restitution." *Id.* Likewise, an "unsworn statement of the prosecutor is insufficient to support the amount of restitution ordered." *State v. Shelton*, 167 N.C. App. 225, 233, 605 S.E.2d 228, 233 (2004).

¶ 46     Here, the State informed the trial court that the owner of the house did "not wish to be here for sentencing," but that the State requested $40,000 in restitution. The State presented the trial court with a restitution worksheet requesting that amount, which the trial court then ordered. The State did not present any testimony or documents to support the requested $40,000 amount except for the worksheet. *See Moore*, 365 N.C. at 285, 715 S.E.2d at 849. We agree with the parties that the restitution award is not supported by sufficient evidence and therefore vacate and remand that portion of Lance's sentence for further proceedings.

## Conclusion

¶ 47     For the reasons discussed above, we find no error in the trial court's judgment,

but we vacate the trial court's award of restitution and remand for further proceedings on that issue.

NO ERROR IN PART; VACATED AND REMANDED IN PART.

Judges CARPENTER and WOOD concur.