STATE OF NORTH CAROLINA v. EDWARD JUNIOR WAGONER, Defendant

No. COA08-982

(Filed 1 September 2009)

**1. Constitutional Law— ex post facto—satellite monitoring— not criminal punishment**

The enrollment of an indecent liberties defendant in the satellite-based monitoring (SBM) system did not violate the constitutional *ex post facto* prohibition because the legislature did not intend SBM to be criminal punishment.

**2. Constitutional Law— double jeopardy—satellite monitoring—not criminal punishment**

The failure of the attorney of an indecent liberties defendant to advance a double jeopardy argument against the imposition of satellite-based monitoring was not ineffective assistance of counsel. That claim is available only in criminal matters, and this was not a criminal mater. The claim of double jeopardy fails for the same reason.

**3. Criminal Law— plea bargain—subsequent satellite monitoring requirement**

The imposition of a satellite-based monitoring system on an indecent liberties defendant did not violate his plea agreement.

Judge ELMORE dissents in a separate opinion.

Appeal by defendant from order entered on or about 19 February 2008 by Judge Henry E. Frye, Jr. in Superior Court, Wilkes County. Heard in the Court of Appeals 28 January 2009.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Yvonne B. Ricci, for the State.*

*Richard E. Jester, for defendant-appellant.*

STROUD, Judge.

Defendant was ordered to enroll in satellite-based monitoring pursuant to N.C. Gen. Stat. § 14-208.40B. Defendant appeals, arguing the trial court erred in (1) violating defendant's "constitutional rights in violation of the prohibition against *ex post facto* punishments[,]" (2) violating "his right to be free from double jeopardy[,]" and (3) "imposing any condition or restriction upon the defendant which was

not specifically agreed to in his plea bargain with the State of North Carolina in violation of the specific agreements." For the following reasons, we affirm.

## I. Background

On or about 27 February 1996, defendant pled no contest to attempted first degree sex offense and one count of indecent liberties; defendant was sentenced to five years imprisonment. Also on or about 27 February 1996, defendant pled guilty to committing a crime against nature and one count of indecent liberties; defendant was sentenced to two years imprisonment. On or about 18 January 2005, defendant pled no contest to the charge of indecent liberties with a child and was sentenced to 20 to 24 months, but received a suspended sentence. On or about 14 November 2005, defendant's suspended sentence was activated because he violated the conditions of his probation.

On 7 January 2008, the Department of Correction ("DOC") notified defendant of a scheduled hearing regarding satellite-based monitoring ("SBM"). On 12 February 2008, counsel was appointed to represent defendant regarding his SBM hearing. On or about 19 February 2008, the SBM hearing was held. Defendant and his counsel attended the hearing but did not present any documentary evidence or testimony. Defendant was ordered to enroll in SBM for the remainder of his life because he was found to be a recidivist. Defendant appeals from the order requiring him to enroll in SBM, arguing the trial court erred in (1) violating defendant's "constitutional rights in violation of the prohibition against *ex post facto* punishments[,]" (2) violating "his right to be free from double jeopardy[,]" and (3) "imposing any condition or restriction upon the defendant which was not specifically agreed to in his plea bargain with the State of North Carolina in violation of the specific agreements." For the following reasons, we affirm.

## II. *Ex Post Facto* Law

[1] Defendant first contends that

> [s]atellite-based monitoring of sex offenders was first enacted two years after [defendant] admitted he had taken indecent liberties with a minor. The Statute by which he was returned to Court became law more than three years after his offense. Ordering him to enroll in satellite-based monitoring for the remainder of his life constituted an *ex post facto* punishment in violation of our law.

## A. Standard of Review

The standard of review for determining whether SBM violates the Constitutional prohibition on *ex post facto* law is *de novo*. *State v. Bare* 197 N.C. App. 461, 464, —— S.E.2d ——, —— (2009) (citation omitted). Furthermore, "[b]ecause both the federal and state constitutional *ex post facto* provisions are evaluated under the same definition, we analyze defendant's state and federal constitutional contentions jointly." *Id.* at 464, —— S.E.2d at —— (quotation marks omitted) (*quoting State v. White*, 162 N.C. App. 183, 191, 590 S.E.2d 448, 454 (2004)).

## B. Analytical Framework for *Ex Post Facto* Challenges to SBM

The prohibition against *ex post facto* laws applies to:

> . . . Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. . . .
>
> . . . .

In determining whether a law inflicts a greater punishment than was established for a crime at the time of its commission, we first examine whether the legislature intended SBM to impose a punishment or to enact a regulatory scheme that is civil and nonpunitive.

If the intent of the legislature was to impose punishment, that ends the inquiry. If however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the legislature's intention to deem it civil.

Because we ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.

Whether a statutory scheme is civil or criminal is first of all a question of statutory construction. We consider the statute's text and its structure to determine the legislative objective. A conclusion that the legislature intended to punish would satisfy an *ex post facto* challenge without further inquiry into its effects, so considerable deference must be accorded to the intent as the leg-

islature has stated it. Where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning. However, if the language of the statute is ambiguous or lacks precision, or is fairly susceptible of two or more meanings, the intended sense of it may be sought by the aid of all pertinent and admissible considerations. Proper considerations include the law as it existed at the time of its enactment, the public policy of the State as declared in judicial opinions and legislative acts, the public interest, and the purpose of the act.

In discerning the intent of the General Assembly, statutes *in pari materia* should be construed together and harmonized whenever possible. The courts must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. It is well settled that statutes dealing with the same subject matter must be construed *in pari materia,* as together constituting one law.

The SBM provisions were enacted by N.C. Sess. Laws 2006-247, § 1(a) which states: This act shall be known as An Act To Protect North Carolina's Children/Sex Offender Law Changes. The SBM provisions are located in part 5 of Article 27A of Chapter 14 of the General Statutes. Art. 27A of Chapter 14 of the General Statutes is entitled Sex Offender and Public Protection Registration Programs. The SBM system is required to provide time-correlated and continuous tracking of the geographic location of the subject using a global-positioning system based on satellite and other location tracking technology and reporting of subject's violations of prescriptive and proscriptive schedule or location requirements. Frequency of reporting may range from once a day (passive) to near real-time (active).

The sex offender monitoring program monitors two categories of offenders. The first category is any offender who is convicted of a reportable conviction defined by N.C. Gen. Stat. § 14-208.6(4) and required to register as a sex offender under Part 3 of Article 27A because he . . . is classified as a sexually violent predator, is a recidivist, or was convicted of an aggravated offense as defined in G.S. § 14-208.6. The second category is any offender who satisfies four criteria: (1) is convicted of a reportable conviction defined by § 14-208.6(4), (2) is required to

register under Part 2 of Article 27A, (3) has committed an offense involving the physical, mental, or sexual abuse of a minor, and (4) based on a risk assessment program, requires the highest possible level of supervision and monitoring.

In construing the statute as a whole, we conclude the legislature intended SBM to be a civil and regulatory scheme. This Court has interpreted the legislative intent of Article 27A as establishing a civil regulatory scheme to protect the public. By placing the SBM provisions under the umbrella of Article 27A, the legislature intended SBM to be considered part of the same regulatory scheme as the registration provisions under the same article.

*Id.* at 464, —— S.E.2d at —— (citations, quotation marks, brackets, heading, and footnote omitted).

1. Legislative Intent

Defendant claims that the legislative intent to make SBM a criminal sanction, and thus subject to the *ex post facto* prohibition, is demonstrated through: (1) use of the term "intermediate sanction" to describe SBM in Section 16 of House Bill 1896, (2) imposing SBM "as [a] condition[] of probation, parole, and post-release supervision," (3) selecting the DOC "as the governmental entity to develop and supervise" SBM, (4) not specifying "that enrollment orders would enter in any forum other than a sentencing hearing in criminal court[,]" (5) replacing the word "probation" with "cooperation" in House Bill 29 in "a clumsy cosmetic effort to disguise the penal nature of" SBM, (6) requiring "that determinations of eligibility for [SBM] be made while offenders awaited sentencing . . . or, as in the present case, had registered as sex offenders after their release from prison[,]" (7) placing "the responsibility for initiating eligibility determinations on the District Attorney for offenders awaiting sentencing . . . and on the Department of Corrections for offenders already released[,] (8) not creating "administrative proceedings for eligibility determinations, but mandat[ing] that the determinations be made in courts of law[,]" and (9) not authorizing "non-judicial officers to make the final eligibility determination[, but] [i]nstead . . . direct[ing] superior court judges to issue eligibility orders." In *Bare,* this Court fully addressed defendant's arguments above regarding issues 1, 2, 3, and 7; accordingly, these arguments are overruled. *See id.* at 461, —— S.E.2d at ——. We will now address defendant's remaining contentions that the legislature intended that SBM be criminal punishment.

a. Involvement of the Criminal Justice System

Defendant contends that

[(Defendant's argument number 4 above:)] [the] Legislature did
not specify that enrollment orders would enter in any forum
other than a sentencing hearing in criminal court[,]

. . . .

[and, (Defendant's argument number 6 above:)] House Bill 29 . . .
filled a void in the enacting legislation by specifying how offend-
ers would be placed on satellite-based monitoring, and did so in
a manner which again evidenced the penal nature of the scheme.
The Legislature required that determinations of eligibility for
satellite-based monitoring be made while offenders awaited sen-
tencing . . . or, as in the present case, had registered as sex offend-
ers after their release from prison[.]

In considering Alaska's sex offender registration statutes on a dif-
ferent issue the United States Supreme Court noted, "Invoking the
criminal process in aid of a statutory regime does not render the
statutory scheme itself punitive." *Smith v. Doe*, 538 U.S. 84, 96, 155
L. Ed. 2d 164, 179 (2003). Furthermore, North Carolina's registration
of sex offenders is maintained by the offender's local sheriff's depart-
ment, but our courts have found that registration was not intended as
punitive. *See* N.C. Gen. Stat. § 14-208.7 (2007); *State v. Sakobie*, 165
N.C. App. 447, 452, 598 S.E.2d 615, 618 (2004); *State v. White*, 162 N.C.
App. 183, 198, 590 S.E.2d 448, 458 (2004). We agree with *Smith*, in that
mere involvement of "the criminal process in aid of a statutory regime
does not render the statutory scheme itself punitive." *Smith* at 96, 155
L. Ed. 2d at 179.

b. "Probation" Replaced with "Cooperation"

Defendant next points to the language of the 2007 revision to N.C.
Gen. Stat. § 14-208.42 and argues that the revision was an attempt by
the General Assembly to cover up its punitive intent. The 2006 ver-
sion of N.C. Gen. Stat. § 14-208.42 provided that

[n]otwithstanding any other provision of law, when the court
sentences an offender who is in the category described by G.S.
14-208.40(a)(1) for a reportable conviction as defined by G.S.
14-208.6(4), and orders the offender to enroll in a satellite-based
monitoring program, the court shall also order that the offender,

upon completion of the offender's sentence and any term of parole, post-release supervision, intermediate punishment, or supervised probation that follows the sentence, continue to be enrolled in the satellite-based monitoring program for the offender's life and be placed on unsupervised *probation* unless the requirement that the person enroll in a satellite-based monitoring program is terminated pursuant to G.S. 14-208.43.

N.C. Gen. Stat. § 14-208.42 (2006). (emphasis added). The 2007 version of N.C. Gen. Stat. § 14-208.42, which is applicable to defendant provides that

[n]otwithstanding any other provision of law, when an offender is required to enroll in satellite-based monitoring pursuant to G.S. 14-208.40A or G.S. 14-208.40B, upon completion of the offender's sentence and any term of parole, post-release supervision, intermediate punishment, or supervised probation that follows the sentence, the offender shall continue to be enrolled in the satellite-based monitoring program for the period required by G.S. 14-208.40A or G.S. 14-208.40B unless the requirement that the person enroll in a satellite-based monitoring program is terminated pursuant to G.S. 14-208.43.

The Department shall have the authority to have contact with the offender at the offender's residence or to require the offender to appear at a specific location as needed for the purpose of enrollment, to receive monitoring equipment, to have equipment examined or maintained, and for any other purpose necessary to complete the requirements of the satellite-based monitoring program. The offender shall *cooperate* with the Department and the requirements of the satellite-based monitoring program until the offender's requirement to enroll is terminated and the offender has returned all monitoring equipment to the Department.

N.C. Gen. Stat. § 14-208.42 (2007) (emphasis added).

Defendant contends that the 2007 amendment "manifested a clumsy cosmetic effort to disguise the penal nature of satellite-based monitoring" by replacing the requirement of "unsupervised probation" with "cooperat[ion] with the Department[.]" *Id.* (2006)-(2007). Defendant directs our attention to *State v. Hearst*, where the term "residential treatment" was substituted in a statute for "confinement." 356 N.C. 132, 137, 567 S.E.2d 124, 128 (2002). In *Hearst*, the North Carolina Supreme Court determined that

the 1998 amendments did not make any substantive changes to the program itself. While we acknowledge that the wording used in the title of an act can provide useful guidance, we hold that this change in terminology is merely cosmetic and does not clearly demonstrate a legislative intent that the IMPACT program should not qualify for credit under N.C.G.S. § 15-196.1.

*Id.* at 137, 567 S.E.2d at 128.

We must therefore consider whether the 2007 amendment made a substantive change to the statute. *See id.* The 2006 version of N.C. Gen. Stat. § 14-208.42 required that offenders be placed on unsupervised probation. *See* N.C. Gen. Stat. § 14-208.42 (2006). The 2007 version of N.C. Gen. Stat. § 14-208.42 removes the requirement of unsupervised probation and instead enables the DOC to contact defendant "to receive monitoring equipment, to have equipment examined or maintained, and for any other purpose necessary to complete the requirements of the satellite-based monitoring program." *Id.* (2007).

N.C. Gen. Stat. § 15A-1343(b) sets forth the regular conditions of unsupervised probation as follows:

(1)  Commit no criminal offense in any jurisdiction.

. . . .

(4)  Satisfy child support and other family obligations as required by the court. If the court requires the payment of child support, the amount of the payments shall be determined as provided in G.S. 50-13.4(c).

(5)  Possess no firearm, explosive device or other deadly weapon listed in G.S. 14-269 without the written permission of the court.

. . . .

(7)  Remain gainfully and suitably employed or faithfully pursue a course of study or of vocational training that will equip him for suitable employment. A defendant pursuing a course of study or of vocational training shall abide by all of the rules of the institution providing the education or training, and the probation officer shall forward a copy of the probation judgment to that institution and request to be notified of any violations of institutional rules by the defendant.

. . . .

(9) Pay the costs of court, any fine ordered by the court, and make restitution or reparation as provided in subsection (d).

(10) Pay the State of North Carolina for the costs of appointed counsel, public defender, or appellate defender to represent him in the case(s) for which he was placed on probation.

. . . .

(12) Attend and complete an abuser treatment program if (i) the court finds the defendant is responsible for acts of domestic violence and (ii) there is a program, approved by the Domestic Violence Commission, reasonably available to the defendant, unless the court finds that such would not be in the best interests of justice.

N.C. Gen. Stat. § 15A-1343(b) (2007). If an offender were placed on unsupervised probation, all of the ·conditions in N.C. Gen. Stat. § 15A-1343(b) could apply. However, none of the conditions of probation enumerated above are now required by N.C. Gen. Stat. § 14-208.42. *Compare* N.C. Gen. Stat. §§ 14-208.42 (2007); 15A-1343(b). Unlike in *Hearst*, the legislature did "make . . . substantive changes to the program itself." *Hearst* at 137, 567 S.E.2d at 128. The requirements of SBM under the 2007 revision are quite different from the conditions of unsupervised probation as required by the 2006 statute. *Compare* N.C. Gen. Stat. § 14-208.42 (2006)-(2007). The amendment establishes a different way of maintaining SBM which is not merely a "cosmetic" change. *Compare* N.C. Gen. Stat. § 14-208.42 (2006)-(2007); *but see Hearst* at 137, 567 S.E.2d at 128. Furthermore, the 2007 amendment does not indicate a legislative intent that SBM be a criminal punishment, as the "cooperation" required by the revised statute is less restrictive than the "unsupervised probation" required by the 2006 statute. N.C. Gen. Stat. § 14-208.42 (2006)-(2007).

c. Determinations of Enrollment in SBM Made in Courts of Law by Superior Court Judges

Defendant also argues SBM was intended to be punitive because

[(Defendants argument number 8 above:)] [t]he Legislature did not create administrative proceedings for eligibility determinations, but mandated that the determinations be made in courts of law[,] . . . [and (Defendant's argument number 9 above:)] [t]he Legislature did not authorize non-judicial officers to make the

final eligibility determination. Instead, the Legislature directed superior court judges to issue eligibility orders.

However, our courts of law and superior court judges serve numerous non-punitive purposes and their involvement is certainly not determinative of a civil or criminal scheme. Indeed, North Carolina's Superior Courts have jurisdiction regarding many different types of civil matters. *See, e.g.,* N.C. Gen. Stat. §§ 7A-241 (2007) ("Exclusive original jurisdiction for the probate of wills and the administration of decedents' estates is vested in the superior court division[.]"); -245 (2007) ("The superior court division is the proper division . . . for the trial of civil actions where the principal relief is" certain types of injunctive and declaratory relief.); -246 (2007) ("The superior court division is the proper division . . . for the hearing and trial of all special proceedings . . . ."); -247 (2007) ("The superior court division is the proper division . . . for the trial of all civil actions seeking as principal relief the remedy of quo warranto . . . ."); -248 (2007) ("The superior court division is the proper division . . . for the trial of all actions and proceedings wherein property is being taken by condemnation . . . ."); -249 (2007) ("The superior court division is the proper division . . . for actions for corporate receiverships[.]"). Therefore, the involvement of "courts of law" and "superior court judges" does not indicate a punitive legislative intent.

d. Conclusion Regarding Legislative Intent

We thus agree with *Bare* that

[d]efendant has failed to direct us to any considerations which would support his contention that the General Assembly intended that SBM . . . be a criminal punishment. Therefore, in accord with our prior cases regarding sex offender registration, we again conclude that Article 27A of Chapter 14 of the North Carolina General Statutes, entitled "Sex Offender and Public Protection Registration Programs," which now includes "Part 5. Sex Offender Monitoring," was intended as "a civil and not a criminal remedy."

*Bare* at 466, —— S.E.2d at —— (citation and brackets omitted). Defendant's contentions that the legislature intended SBM to be a criminal punishment are without merit.

2. Punitive in Purpose or Effect

We now must consider "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to

deem it civil." *Id.* at 465, —— S.E.2d at —— (citation and quotation marks omitted). However, all of defendant's contentions regarding the punitive effect of SBM have been fully addressed in *Bare. See id.* at 465, —— S.E.2d at ——. Defendant presented no evidence before the trial court as to the punitive effects upon him nor any argument which would permit us to distinguish defendant's situation from that of the defendant in *Bare.*[1] We are controlled by *Bare's* conclusion that

> the restrictions imposed by the SBM provisions do not negate the legislature's expressed civil intent. Defendant has failed to show that the effects of SBM are sufficiently punitive to transform the civil remedy into criminal punishment. Based on the record before us, retroactive application of the SBM provisions do not violate the *ex post facto* clause.

*Id.* at 478, —— S.E.2d at ——.

We recognize, as noted by the dissent, that there may be serious legal issues raised by the DOC's manner of execution of SBM under some provisions of the DOC's Sex Offender Management Interim Policy ("Interim Policy"). However, just as in *Bare,* 197 N.C. App. 461, —— S.E.2d ——, those issues regarding the execution of SBM have not been raised by either party in this case and our record contains no evidence, and certainly no findings by the trial court, as to the Interim Policy or details of SBM as applied to defendant. Defendant has challenged the constitutionality of the *statute* under which he was ordered to enroll in SBM, N.C. Gen. Stat. § 14-208.40B; defendant has not challenged the Interim Policy. Pursuant to our record, neither defendant nor the State mentioned the Interim Policy before the trial court or in their briefs. Although this Court may have the ability to take judicial notice of the Interim Policy, we have not had the benefit of briefing and arguments regarding the Interim Policy. For these reasons, we have addressed only the issues presented to us in this case, based upon the arguments and record presented in this case.

### III. Ineffective Assistance of Counsel and Double Jeopardy

**[2]** Defendant argues that he had ineffective assistance of counsel due to his counsel's failure to "advance a legally sound double jeopardy argument." Defendant contends that his right to be free from

---

1. This Court can consider only the information in the record before us, and the record reveals almost nothing about how SBM is performed or its effects upon defendant. Indeed, the record does not even reveal the size of the SBM monitoring unit or how it is operated and maintained.

double jeopardy has been violated because he has been subjected to an additional punishment for his prior convictions of sexual offenses. "The Double Jeopardy Clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *State v. Gardner*, 315 N.C. 444, 451, 340 S.E.2d 701, 707 (1986) (citations omitted).

We first note that a claim for ineffective assistance of counsel is available only in criminal matters, and we have already concluded that SBM is not a criminal punishment. *See* U.S. Const. amend. VI. (emphasis added) ("In all *criminal prosecutions*, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); *see generally Alford v. Lowery*, 154 N.C. App. 486, 491, 573 S.E.2d 543, 546 (2002) ("Plaintiff cites no authority and we have found no precedent for setting aside a jury verdict in a civil case based on ineffective assistance of counsel.").

However, even if we assume that defendant could raise an ineffective assistance of counsel argument in this context, an argument that SBM violates double jeopardy would fail because SBM is a civil regulatory scheme. Defendant has not been prosecuted a second time for any previously committed offenses, but contends he has been subjected to additional punishments. As we have already held that SBM is a civil regulatory scheme, and not a punishment, double jeopardy does not apply. *See Kansas v. Hendricks*, 521 U.S. 346, 369, 138 L. Ed. 2d 501, 519 (1997) ("Our conclusion that the Act is non-punitive thus removes an essential prerequisite for . . . double jeopardy . . . claims."). This argument is without merit.

## IV. Violation of Plea Bargain

[3] Lastly, defendant contends that "[t]he trial court erred in imposing any condition or restriction upon the defendant which was not specifically agreed to in his plea bargain with the State of North Carolina in violation of the specific agreements." Again, *Bare* has fully addressed this issue and we are bound by its precedent which has determined that SBM does not violate defendant's plea agreement. *See Bare* at 478, S.E.2d at ——. This argument is overruled.

## V. Conclusion

We conclude that defendant's enrollment in SBM does not violate prohibitions against *ex post facto* law or double jeopardy. Furthermore, defendant's plea bargain has not been violated. We

therefore affirm the trial court's order requiring defendant to enroll in SBM.

AFFIRMED.

Judge CALABRIA concurs.

Judge ELMORE dissents in a separate opinion.

ELMORE, Judge, dissenting.

I respectfully dissent from the majority opinion affirming the trial court's order requiring defendant to enroll in satellite-based monitoring. Although I recognize that most of defendant's arguments were addressed by this Court several months ago in *State v. Bare*, I believe that we have the benefit of an expanded record in this case, which makes defendant's case distinguishable from Mr. Bare's. In *Bare*, we explained repeatedly that our conclusions were based upon the record before us and that the record could not support a contrary finding. 197 N.C. App. 461, 473-75, 677 S.E.2d 518, 528 (2009). I believe that the record before us now can and should support a contrary finding.

Here, we may augment the record on appeal by taking judicial notice of the DOC's "Sex Offender Management Interim Policy" (Interim Policy). "The device of judicial notice is available to an appellate court as well as a trial court[.] This Court has recognized in the past that important public documents will be judicially noticed." *State ex rel. Utilities Com. v. Southern Bell Tel. & Tel. Co.*, 289 N.C. 286, 288, 221 S.E.2d 322, 323 (1976) (quotations and citations omitted). Although the DOC has not yet drafted final regulations governing the SBM program that are available in our state register, its interim policy is the sort of public document of which this Court may take judicial notice. *See, e.g., W. R. Co. v. North Carolina Property Tax Com.*, 48 N.C. App. 245, 261, 269 S.E.2d 636, 645 (1980) (stating that we may take judicial notice of a corporate charter on file with the Secretary of State but not included by either party in the record on appeal). Our opinion in *Bare* makes no mention of the DOC's Interim Policy and thus, in my opinion, the contents of the Interim Policy are new facts and circumstances unique to defendant's appeal.

## A. Ex Post Facto Punishment

I respectfully disagree with the majority's conclusion that SBM has no punitive purpose or effect and thus does not violate the *ex*

*post facto* clause. To determine whether a statute is penal or regulatory in character, a court examines the following seven factors, known as the *Mendoza-Martinez* factors:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 9 L. Ed. 2d 644, 661 (1963) (footnotes and citations omitted). Although these factors "may often point in different directions[, a]bsent conclusive evidence of [legislative] intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face." *Id.* at 169, 9 L. Ed. 2d at 661. Because I agree with the majority that there is no conclusive evidence that the legislative intended the SBM statute to be penal, I begin my analysis by examining the seven *Mendoza-Martinez* factors.

**1. Affirmative disability or restraint.** The first question is "[w]hether the sanction involves an affirmative disability or restraint." *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 661 (footnote and citations omitted). To echo the Supreme Court of Indiana, "[t]he short answer is that the Act imposes significant affirmative obligations and a severe stigma on every person to whom it applies." *Wallace v. State*, 905 N.E.2d 371, —— (Ind. 2009). Both the SBM statutory provisions and its implementing guidelines require affirmative and intrusive post-discharge conduct under threat of prosecution.

In addition to the regular sex offender registration program requirements, which, though judicially determined to be non-punitive, are nevertheless significant in practice, SBM monitoring participants are subject to the following additional affirmative disabilities or restraints: (1) The DOC has "the authority to have contact with the offender at the offender's residence or to require the offender to appear at a specific location as needed[.]" N.C. Gen. Stat. § 14-208.42 (2007). (2) "The offender *shall* cooperate with the [DOC] and the requirements of the satellite-based monitoring program[.]" *Id.*

(emphasis added). (3) An offender is subject to unannounced warrantless searches of his residence every ninety days. N.C. Dep't of Correction Policies-Procedures, No. VII.F Sex Offender Management Interim Policy 12 (2007). (4) An offender must maintain a daily schedule and curfew as established by his DOC case manager. An offender's schedule and curfew includes spending at least six hours each day at his residence in order to charge his portable tracking device. *Id.* at 15. (5) "If the offender has an active religious affiliation," the offender's case manager must "notify church officials of the offender's criminal history and supervision conditions[.]" *Id.* at 12.

In addition, the DOC has created maintenance agreements that all program participants must sign. Form DCC-44 applies to supervised sex offenders (monitoring) and form DCC-45 applies to unsupervised sex offenders (tracking). DCC-45, which is slightly less burdensome than DCC-44, requires the offender to agree to the following affirmative disabilities or restraints or else face criminal prosecution:

4. My location will be monitored by a tamper proof, non-removable ankle transmitter and a receiver. I will be required to wear the transmitter and carry the receiver with me 24 hours a day, 7 days a week.

5. I understand that it is my responsibility to charge the receiver for a minimum of four (4) hours each 24-hour period to enable the equipment to work properly. I understand that charging the receiver requires electric service to be available.

6. I understand a unit in the home will be assigned to me and it will be necessary for a designated representative of DCC to enter my residence or other location(s) where I may temporarily reside to install, retrieve, or periodically inspect the unit in order to maintain tracking as required.

7. I understand I must place the receiver in an area that is unobstructed with the receiver display screen facing out at all times. The receiver should not be covered by metal containers, lockers, vehicle trunks, etc. or hidden under clothing, car seats, purses, briefcases, tote bags, etc.

\* \* \*

9. In order to maintain equipment and receive necessary communications, I agree to reside at \_\_\_\_, \_\_\_\_ with contact

phone number ____. Prior to changing my residence, I will contact the appropriate DCC representative and the Sheriff's Office where I am registered with my new address.

10. I understand that messages may be sent to me via my receiver. I will acknowledge these messages and follow the instructions in order to maintain the equipment.

Clearly, the SBM program imposes affirmative and intrusive post-discharge conduct upon offenders long after they have completed their sentences, their parole, their probation, and their regular post-release supervision; these restraints continue forever.

Though some may argue that the remaining restrictions are mere inconveniences, this would be a deceiving understatement. Although offenders are no longer subject to formal probation, the requirements that they are subject to are nearly if not equally intrusive: they cannot spend nights away from their homes, they are subject to schedules and curfews, they must appear on command, and they must submit to all DOC requests and warrantless searches. An offender's freedom is as restricted by the SBM monitoring requirements as by the regular conditions of probation, which include: remaining in the jurisdiction unless the court or a probation officer grants written permission to leave, reporting to a probation officer as directed, permitting the probation officer to visit at reasonable times, answering all reasonable inquiries by the probation officer, and notifying the probation officer of any change in address or employment. In addition, submission to warrantless searches is not a regular condition of probation and is instead a special condition of probation.

Accordingly, I believe that SBM imposes an affirmative disability or restraint upon defendant, which weighs in favor of the SBM statute being punitive rather than regulatory.

**2. Sanctions that have historically been considered punishment.** The next question is whether SBM "has historically been regarded as a punishment." *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 661 (footnote and citations omitted). Obviously, satellite monitoring technology is new and thus tracking offenders using the technology is not a historical or traditional punishment. However, the additional restrictions imposed upon offenders are considered punishments, both historical and current. In addition, some courts have suggested that the SBM units, made up of an ankle bracelet and a miniature tracking device (MTD), are analogous to the historical pun-

ishments of shaming. *See, e.g., Doe v. Bredeson*, 507 F.3d 998, 1010 (Keith, J., concurring in part and dissenting in part).

In *Bredeson*, the Sixth Circuit considered whether Tennessee's SBM statute violated the *ex post facto* clause. The *Bredeson* majority first held that the Tennessee legislature's purpose when enacting the SBM statute was to establish a civil, nonpunitive regime. *Id.* at 1004. The majority then examined the *Mendoza-Martinez* factors and concluded, in relevant part, that Tennessee's SBM program was not a sanction historically regarded as punishment. *Id.* at 1005. It explained that the Tennessee "Registration and Monitoring Acts do not increase the length of incarceration for covered sex offenders, nor do they prevent them from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation." *Id.* Judge Keith, in his dissent, characterized the GPS monitoring system as a "catalyst for ridicule" because the defendant's monitoring device was "visible to the public when worn" and had to "be worn everywhere" the defendant went. *Id.* at 1010 (Keith, J., dissenting in part and concurring in part). "Public shaming, humiliation, and banishment are well-recognized historical forms of punishments." *Id.* (citations omitted). It is clear from the DOC guidelines and maintenance agreements that the LTD must be worn on the outside of all clothing and cannot be concealed or camouflaged in any way, even though some forms of concealment or camouflage would not interfere with the LTD's function. In addition, an offender's religious institution must be informed of his status and his SBM compliance requirements. I agree with Judge Keith that the SBM scheme is reminiscent of historical shaming punishments, which weighs in favor of finding the scheme punitive, rather than regulatory.

**3. Finding of scienter.** The next question is whether the statute "comes into play only on a finding of *scienter*." *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 661 (footnote and citations omitted). I believe that this factor is met because the underlying criminal acts, indecent liberties with a child and third degree sexual exploitation of a minor, require intentional conduct. *State v. Beckham*, 148 N.C. App. 282, 286, 558 S.E.2d 255, 258 (2002) (citation omitted); *see* N.C. Gen. Stat. § 14-202.1(a) (2007) ("A person is guilty of taking indecent liberties with children if, being 16 years of age or more and at least five years older than the child in question, he either: (1) *Willfully* takes or attempts to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years for the purpose of arousing or gratifying sexual desire; or (2)

*Willfully* commits or attempts to commit any lewd or lascivious act upon or with the body or any part or member of the body of any child of either sex under the age of 16 years."); N.C. Gen. Stat. § 14-190.17A(a) (2007) ("A person commits the offense of third degree sexual exploitation of a minor if, knowing the character or content of the material, he possesses material that contains a visual representation of a minor engaging in sexual activity.").

    **4. Traditional aims of punishment.** The next question is "whether the sanction promotes the 'traditional aims of punishment—retribution and deterrence.' " *Beckham*, 148 N.C. App. at 286, 558 S.E.2d at 258 (quoting *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 661). Without question, the sanction promotes deterrence. For example, offenders are restricted in their movements, ostensibly in part to prevent them from venturing into schoolyards or nurseries; when satellite-monitored offenders venture into these restricted zones, their supervisors are notified and the offender may be charged with a felony. Although "the mere presence of a [deterrent quality] is insufficient to render a sanction criminal [because] deterrence may serve civil, as well as criminal goals," *Hudson v. United States*, 522 U.S. 93, 105, 139 L. Ed. 2d 450, 463 (1997) (quotations and citation omitted), the deterrent effect here is substantial and not merely incidental. Accordingly, it weighs in favor of finding the sanction to be punitive.

    **5. Applicability only to criminal behavior.** The next question is "whether the behavior to which [the] statute applies is already a crime." *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 567 (footnote and citation omitted). The SBM statute applies only to people who have been convicted of "reportable offenses." Thus, this factor weighs in favor of finding the sanction to be punitive.

    **6. Advancing non-punitive interest.** The next question is "whether an alternative purpose to which [the statute] may rationally be connected is assignable for it[.]" *Id.* at 168-69, 9 L. Ed. 2d at 567 (footnote and citation omitted). The SBM statute does advance a rationally related non-punitive interest, which is to keep law enforcement officers informed of certain offenders' whereabouts in order to protect the public. Preventing further victimization by recidivists is a worthy non-punitive interest and one that weighs in favor of finding the sanction to be regulatory.

    **7. Excessiveness in relation to State's articulated purpose.** The final question is "whether [the statute] appears excessive

in relation to the alternative purpose assigned" to it. *Id.* at 169, 9 L. Ed. 2d at 568 (footnote and citation omitted). "The excessiveness inquiry . . . is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith v. Doe,* 538 U.S. 84, 105, 155 L. Ed. 2d 164, 185 (2003) (emphasis added). Judge Keith, dissenting from the majority opinion in *Bredeson,* explained SBM's excessiveness as follows:

> I fail to see how putting all persons in public places on alert as to the presence of offenders, like Doe, helps law enforcement officers geographically link offenders to new crimes or release them from ongoing investigations. It equally eludes me as to how the satellite-based monitoring program prevents offenders, like Doe, from committing a new crime. Although the device is obvious, it cannot physically prevent an offender from re-offending. Granted, it may help law enforcement officers track the offender (after the crime has already been committed), but it does not serve the intended purpose of public safety because neither the device, nor the monitoring, serve as actual preventative measures. Likewise, it is puzzling how the regulatory means of requiring the wearing of this plainly visible device fosters rehabilitation. To the contrary, and as the reflection above denotes, a public sighting of the modern day "scarlet letter"—the relatively large G.P.S. device—will undoubtedly cause panic, assaults, harassment, and humiliation. Of course, a state may improve the methods it uses to promote public safety and prevent sexual offenses, but requiring Doe to wear a visible device for the purpose of the satellite-based monitoring program is not a regulatory means that is reasonable with respect to its nonpunitive purpose.
>
> Sexual offenses unquestionably rank amongst the most despicable crimes, and the government should take measures to protect the public and stop sexual offenders from re-offending. However, to allow the placement of a large, plainly obvious G.P.S. monitoring device on Doe that monitors his every move, is dangerously close to having a law enforcement officer openly escorting him to every place he chooses to visit for all (the general public) to see, but without the ability to prevent him from re-offending. As this is clearly excessive, this factor weighs in favor of finding the Surveillance Act's satellite-based monitoring program punitive.

*Bredesen,* 507 F.3d at 1012 (Keith, J., dissenting). I agree with Judge Keith's assessment; the restrictions imposed upon defendant by the SBM statute are dangerously close to supervised probation if not personal accompaniment by a DOC officer. The *Bredeson* majority dismissed Justice Keith's concerns about the device's visibility by stating its "belie[f] that the dimensions of the system, while not presently conspicuous, will only become smaller and less cumbersome as technology progresses." *Id.* at 1005. Smaller, less conspicuous, and less cumbersome technologies already exist, but implementation of new technologies is expensive and time-consuming. Though we may one day be able to tag and release a recidivist sex offender as though he were a migrating songbird, it is not a practical reality for defendant at this time or in the immediate future. The SBM equipment and accompanying restrictions as they *exist now* support a conclusion that SBM is a punishment.

In sum, of the seven factors specifically identified by the U.S. Supreme Court in *Mendoza-Martinez* as relevant to the inquiry of whether a statute has a punitive effect despite legislative intent to the contrary, I believe that six factors point in favor of treating the SBM provisions as punitive. Only one—that the statute advances a non-punitive purpose—points in favor of treating the SBM provisions as non-punitive. Accordingly, I would hold that defendant's enrollment in the SBM program constitutes a punishment.

Accordingly, I would also hold that defendant's enrollment in the SBM program constitutes an unconstitutional *ex post facto* punishment.

**B. Ineffective Assistance of Counsel and Double Jeopardy**

I also respectfully disagree with the majority's analysis of defendant's ineffective assistance of counsel argument. Because I would hold that SBM is a criminal punishment, not a civil regulatory scheme, I would not dismiss this argument on those bases.

**C. Violation of Plea Bargain**

Finally, I respectfully disagree with the majority's analysis of defendant's argument that the trial court erred by imposing a condition upon defendant that was not specifically agreed to in his plea bargain. "Although a plea agreement occurs in the context of a criminal proceeding, it remains contractual in nature. A plea agreement will be valid if both sides voluntarily and knowingly fulfill every aspect of the bargain." *State v. Rodriguez,* 111 N.C. App. 141, 144, 431 S.E.2d 788, 790 (1993) (citations omitted). We explained that, because a defend-

ant surrenders fundamental constitutional rights when he pleads guilty based upon the State's promise, "when a prosecutor fails to fulfill promises made to the defendant in negotiating a plea bargain, the defendant's constitutional rights have been violated and he is entitled to relief." *Id.* at 145, 431 S.E.2d at 790 (quotations and citations omitted). Accordingly, I would hold that defendant received a punishment in excess of what he was promised in exchange for his guilty plea in violation of his constitutional rights.

For the foregoing reasons, I would reverse the order imposing lifetime satellite-based monitoring upon defendant.